Good morning. May it please the Court, I'm Richard Weiss from Broward Piven. I'd like to reserve three minutes of my time for rebuttal. The essence of plaintiff's claim in this case is that defendants Vivus and two of its senior most executive officers downplayed and failed to disclose known material risks that would affect the likelihood and timing of FDA approval and commercialization of Vivus' new drug Kinexa. This case is not about whether defendants accurately predicted the safety of Kinexa or whether it would ultimately be approved by the FDA. There's no question at all relevant times here defendants had full clinical data regarding the drug's safety. The case starts with their announcement of results from two year-long Phase III trials. The district court fundamentally erred in holding that there was no falsity here. The FDA advisory panel, which voted against approving Kinexa, agreed, based on its review of all the clinical data Vivus had submitted, that increased heart rate was a significant concern and called for more study of cardiovascular issues. What's hard here is that with later history we know that in fact a year later the drug was approved, and it really does make that first decision one much more of, no, there's not a problem with it, but in context and given the history of the ingredients here, we want more time. What was specifically false about any of the statements made before? As we lay out in our briefs, the defendants were unduly positive about the safety. See, that's what gets hard, because I frankly don't find things that are specifically false. And here's where we get to the approval process. You carefully note accurately that your case isn't that they falsely predicted. They didn't say the FDA is going to approve, we'll be on the market, and so forth. But that speaks very much to the apparent significance of the information, and that is, what is it that tells us that defendants perceive this information to be so significant, so material, as to be information that's going to result in the year delay that they got in getting their drugs approval? Actually, it took two years before they got the drug ultimately approved. And one of the issues here is not simply whether the drug would be approved, but its commercial prospects. And a two-year delay for a company that had no, only one other drug at the time, and for which this was a critical drug, was certainly highly material. Why? I don't understand the logic of that. Two years of lost revenues. Well, it speaks to that company. But if the drug's going to make it, you haven't raised the question as to whether the company was going to be able to survive in the meantime. So if it's going to make it to the market, it's going to make it to the market. The complaint has ample allegations that the company was in difficult financial strait. It had been losing money since it started. It had an accumulated deficit of over $200 million by the end of 2009, when the drug, during the class period. Defendants themselves, in statements to the public, admitted that the company needed money in order to complete the testing of its drugs, that it didn't have enough resources. During the class period, defendants launched a, an offering of stock, which they raised over $100 million in needed funds to complete the testing for the drug. We don't know exactly why the FDA ultimately approved it. Those facts and that is not, goes beyond the complaint and really what's in the record before the Court. But we do know that the FDA. Are you saying we can't consider the fact that it was ultimately approved? Well, I think the Court can take note that it was ultimately approved, but we don't know why and what balancing of concerns regarding issues of obesity in the country versus the safety issues, and whether or not the drug was ultimately approved, the safety concerns are still concerns. They affect the marketability of the drug. It's commercial prospects. It's which patients it's appropriate for. And defendants, in statements during the class period, unduly downplayed those concerns and. So point to a specifically false statement. Okay. For example, with respect to the cardiovascular issues, defendants repeatedly emphasized that there were significant improvements in cardiovascular risk factors, that the CV benefits were outstanding. Defendant Wilson stated that highly statistically significant improvements in all cardiovascular endpoints. And Defendant Day stated that there was no cardiovascular signal to speak of. What's false? Well, those were false. What defendants did, they weren't – statements may have been true as far as they went, but defendants. Well, see, that's where I need to stop you. I understand that there can be statements that appear to be true that are in fact false. In the criminal context, the Barry Bonds case in this courtroom has shown a bright light on that. There's no decision yet. I'm on the panel not speaking to that. But you need to show something more than, gee, it's just a little too positive, don't you? Because that's mostly what I've seen here. Well, I don't think the issue here is not just that they were a little too positive. They were wholly positive without disclosing the serious CV problems that ultimately caused the FDA panel to deny approval of the drug in the initial instance. And even those members of the panel. You told me there was a false statement. You haven't pointed me to a literally false statement yet. I mean, you picked out that as the first example, but you didn't give me something that, okay, this is untrue. Well, again, I would submit it's highly misleading for defendants to state that there were significant improvements in all cardiovascular risk factors when, in fact, the drug created cardiovascular risks that the FDA felt were sufficiently serious to require additional testing. Additionally, with respect to, for example, the increases in the depression levels, which the FDA panel said were of serious concern, defendants emphasized during the class period that overall depression scores were significantly improved, that there were no serious adverse events reported for depression. There are no suicide attempts. Once again, defendants can't make a decision. Are there any suicide attempts? No, but what defendants did was create a false impression in the marketplace that psychiatric issues were not a problem for the drug when, in fact, as the FDA panel later asserted, those were serious concerns. Defendants can't pick and choose when they decide to speak about a subject, those facts that are convenient to them and ignore those that would give a fuller and more complete picture. And amply demonstrating that the market was, in fact, misled by defendants' statements, there was a tremendous drop in the stock price on July 15th when the analysis of the FDA advisory panel was released to the public, that stock dropped more than 50%. But on the 13th, when the FDA briefing paper came out, the stock went up, and the briefing paper basically summarized what happened at the clinical trial. Isn't that right? Well, we submit on the 13th, the FDA released more than 500 pages, the district court's own reckoning, of data and analysis from both itself and the company. Clearly, it's not unreasonable to assume that the market needed at least a few days to digest that information. Yeah, but why would the stock go up then? I mean, wouldn't the market do nothing? I mean, there's got to be some reason it went up, what, 15% or something? Well, as we noted in our papers, the market may have taken some positive reading from the fact that the FDA didn't take a position at that initial time. At least one of the analyst reports that defendants have submitted indicated that there was a positive interpretation from the tone of the FDA's comments. But clearly, it's not unreasonable to assume the market needed some time to assess the information. And two days later, there was a dramatic drop in the stock price. Was it from assessing the information or was it from the bottom line vote? And that doesn't take very long to absorb. Well, the bottom line vote and also the comments of the FDA committee members who looked at and interpreted the data. So they could absorb that instantly, but they couldn't absorb the data two days earlier instantly? Well, there was over 500 pages of data submitted. Bad news was in the first half dozen pages. Again, the market may have been reacting to the tone of the information. And really, I think, given that there was a dramatic drop when the news finally came out, these are matters that are not perhaps properly resolved on a motion to dismiss and are more likely to fit topics for expert analysis at a later time. Defendants also repeatedly told the public during the class period that the benefit risk ratio, that the safety profile for the drug was very compelling, that it was excellent, they said it was extremely safe, that studies showed it was remarkably safe, and that there were no issues of concern from the side effect standpoint. Although the district court dismissed these statements as mere statements of corporate optimism, we submit respectively that that's not so, that there are representations regarding objective clinical data, and that there were clear assertions of fact by defendants. In Virginia Bank shares, the U.S. Supreme Court recognized that the public put special confidence in what corporate management says when it speaks about corporate matters. Additionally, the advisory committee found that the submitted data was inadequate, and defendants should have been aware of that. This is a drug with long-term use. The component Fentramine, which was one of the components of the treatment Fen-Phen, was only a short-term therapy. So again, defendants made these assertions regarding what the safety data showed without qualifying it to indicate that the data was not sufficient to reach firm conclusions. In addition, defendants were aware that the population studied was not representative of the general population. The FDA advisory panel took note of that in its assessment of the data and its The district court also improperly dismissed the allegations from the confidential witnesses. There's simply no reason in a company where there were only a very few employees and perhaps only a dozen salespeople, according to one of the confidential witnesses, that even salespeople would not have received briefings from management as the witnesses related regarding the progress of the drug and the issues surrounding it and the concerns that management had. And those allegations are set forth in the complaint, and we submit that the district court erroneously That management was optimistic that everybody who was in a position to have an opinion appeared to think that FDA approval was going to be achieved, and they communicated that. What does that tell us about what kind of showing does that make with regard to Center? Well, internally, defendants were, according to the confidential witnesses, expressing concerns over the cardiovascular issues and other issues that ultimately proved to be problems, safety issues for the drug. The internal conversations which are reflected in the complaint do not reflect sort of unbridled optimism, but also reflect concerns that management had that later were shared by the FDA panel. But was there anything to suggest those concerns were so serious? I mean, that there are factors that they are concerned about isn't a surprise. But what is it that tells us that the concerns were substantial? Well, the issues were clearly substantial. They were substantial enough that the FDA panel expressed great concern. But the issue here is Center. I mean, what did the defendants know and anticipate? Well, the defendants during the class period had all the same clinical data that the FDA panel ultimately had before. Thank you. I'd like to reserve the balance of my time. If you may, we'll hear from defendants. Good morning, Your Honor. May it please the Court. I'm Michael Charlson of Vinson & Elkins, and we represent Defendant Appellees Vivasink and two of its officers, Leland Wilson and Wesley Day. In 1995, Your Honor, Congress enacted the Private Securities Litigation Reform Act, in large part to nip in the bud with early dismissal allegations of securities fraud where there was, in fact, little to suggest that a fraud had actually occurred. Submit that this case is an archetype of the type that the Congress was looking to target. Judge Hamilton's carefully reasoned 33-page decision should be affirmed, and indeed, this Court's recent precedents in Regal Pharmaceuticals and more recently last summer in Intuitive Surgical mandate that outcome. Judge Hamilton accurately concluded that the plaintiff had not alleged a claim for securities fraud, and she got it right across the board. As Your Honor has just discussed with Mr. Weiss, vague comments that the defendants were, quote, unduly positive, I think was one of his terms, unquote, about the clinical trial data simply doesn't suffice. And it specifically doesn't suffice when it's based entirely on hindsight comments made by members of the Advisory Committee panel at the end of the class period. Well, did the panel members know anything more than your clients knew? I don't believe they did, Your Honor. But I would note that six of the ten of the 16 members of the Advisory Committee agreed with the defendants that the drug wasn't removable at that time. So near yet so far. I mean, if it had been 10 to 6 instead of 6 to 10, we probably wouldn't be here today. But it was 10 to 6 ultimately the wrong way, and the people on the panel didn't know more than the people within the company did, did they? I have no reason to believe that they did, Your Honor. However, differences in clinical judgments are not something that can support a securities fraud action. What's missing here, Your Honor, are allegations of specific facts that indicate that the defendants, when they made their statements about the prospects for this drug's approval and the timing of that approval, which is, we think, a new twist on the allegations here, were that they did not genuinely believe those statements of their own opinions to be accurate. And we have to keep in mind here, Your Honor, a bit of context. And I know that you can get through the entire opening brief and not understand this, but we do have to keep in mind this was a combination therapy of two drugs that had been approved for use in the United States for decades. There were millions of patient years of data on the safety profiles of these drugs. And this was known to the investing public. It was known not only because under the fraud on the market theory, everything that's material about anything is supposedly known, and the plaintiffs invoked that theory, but more specifically because Vivas actually disclosed the facts. Vivas told people that there were likely to be cognitive issues or psychiatric issues in the form of side effects, because topiramate, which is used to control epileptic seizures, has an effect on the brain. And we knew from the world prior to Cunexa that there were psychiatric and cognitive side effects routinely observed. On the cardiovascular front, the plaintiffs confused efficacy with safety. The comments that Mr. Weiss made about significant improvement in cardiovascular indicators were end points for clinical efficacy. And isn't that important here? We're talking about obese people who at the top line in the Phase III trials were able to achieve a 14.7 percent weight loss. And all of these people who were in the study, I believe all of these people, certainly most, were people with significant comorbidities that resulted from their obesity, cardiovascular problems, diabetes, et cetera. And those were the things that we saw great improvement in. Now, they say that we didn't discuss safety. But we did. Two days into the class period, Dr. Day told people that on the safety side of things, there was a one beat per minute increase in heart rate observed. But he gave his opinion that the one beat per minute was not clinically significant, particularly in light of the improvements in cardiovascular function that were observed for across the 4,500 person population that were in these clinical trials. Now, what the plaintiffs don't do is to ever say there was some fact internal to Vivas, some indication from Dr. Day or Mr. Wilson or anyone else in management that they actually believed that the one beat per minute increase in heart rate was actually significant. That's missing. And that's why this complaint is deficient. The argument being made by plaintiffs, as I understand it, includes the question not just whether they thought it was medically significant, but whether they thought or should have thought that it would have an impact on the approval process. Because this is all really driven by the fact that the FDA denied approval that first time around. And so it isn't just that they had to think the drug was dangerous, but that there was enough risk factor that would lead the FDA to require additional testing, as it did. Well, Your Honor, a couple of responses to that. First, the possibility that, I mean, to hear the plaintiffs tell it, we never told anybody anything about this. In fact, if you look at the supplemental excerpts between about pages 124 and 134, 135, you'll see a small portion of the risk disclosures that accompanied this company's SEC filings every single quarter. And in those filings included clear risk disclosures that this was a combination therapy, that it was a combination therapy that included Phentermine that had been part of PhenPhen, that had been pulled from the market because of cardiovascular issues, that because of that the FDA might give the drug greater scrutiny, that the additional testing might delay approval, might cost a lot of money, might mean the drug never gets approved at all. It also included risk factors that there might be cardiovascular or psychiatric or cognitive or other issues with the drug. It included the pregnancy issue that the plaintiffs mentioned, that the drug is counterindicated for women who were pregnant or seeking to become pregnant. But more than that, more fundamentally, it is just implausible to believe that the defendants would proceed with a new drug application, and the huge expense and the institutional distraction that are associated with trying to push a new drug application through the process when they supposedly knew that the drug was not approvable based on the clinical trial data that was available. There's nothing to indicate that that's the case. The reason that they had to know it wasn't approvable, and this is a little slippery, so I'm sure that Mr. Weiss will articulate it better, but as I understand the theory, it isn't that they didn't think it would be approved. It's that the message that was conveyed was overly optimistic, was more optimistic presumably than they actually thought for themselves for the CNTR requirement. And it is true, if you look at the statements, the whole of them, I mean, my eyes glaze over because I don't read most of that stuff very much, and I don't understand the medical stuff at all and so forth. But the sense coming out of it is that, boy, this company is upbeat about this. It recognizes there are some safety risk factors. It recognizes there's certainly the risk the FDA goes off the reservation or whatever. But the sense coming out of it is that this drug is headed for approval. And that's not what happened. Well, it's not what happened at the time, Your Honor. But they had a continuation study already underway. One of the three phase three trials that was the subject of the new drug application in 2009 had continued for another year, was continuing at that time. If they really thought that the data were insufficient, why not just wait? Well, the reason they didn't wait is because they didn't believe that the drug was not approvable at that time based on the data. And they had good reason to believe that. The extraordinary efficacy data here, Your Honor, can't be overlooked. This was 14.7 percent average weight loss, which I understand, and I'm not positive this is in the record, but I understand that's comparable to bariatric surgery. 14.7 percent weight loss with significant demonstrable improvements in comorbidities in an area that's of great medical interest. Obesity has become a national problem, as unfortunately I'm well aware. I should ask for free samples for my own purposes. My wife wants to ask for my free samples. No new drugs have been approved in this area, Your Honor, since the Fenton therapy had been pulled. But more important, the clinical trials we're talking about have been conducted under a special protocol assessment. That is an advanced discussion with the FDA saying this is how we plan to go about this. Here's the plan that we have. And FDA telling Vivas, based on what we've seen here, and they tweak things back and forth, but once the SPA has agreed to, and this is, you know, in a couple of the cases we've cited, including the Chelsea Therapeutics case that was in our 28J letter a few days ago, you know, FDA is saying that based on that protocol assessment, and of course subject to what the clinical trial data actually show, this can lead to approvable results. Additionally, FDA guidance, which we cite in our brief, was that a weight loss drug could be considered for approval on a year's data. And finally, again, Your Honor, it is significant that this was a combination therapy of two drugs that had been prescribed for decades for different indications in the case of topiramate, but they were known to be drugs with a particular safety profile. And in Cunexa, the dosing on those two drugs is actually lower than when you prescribed fentramine or topiramate as a monotherapy. And so when the data showed that the safety profile of the combination therapy was consistent with the individual components, nothing unusual, nothing spikes because of the combination, nothing that we hadn't seen in the individual constituents shows up, this is a reason for optimism. And more significantly than that, Your Honor, there's nothing in the complaint to indicate a specific fact that the plaintiffs have put forward to suggest that they did not genuinely believe what they were telling the public. Now, I'd just like to point a couple of other things out. I mean, their whole theory, as they tell us on page 3 of their opening brief, is that this enthusiasm expressed to defendants was all part and parcel of what the plaintiffs call their desperate, you know, defendants' quote, desperate quest to obtain FDA approval, unquote. Again, I would suggest this is implausible. What on earth would telling investors something have anything to do with the FDA approval process? They're complete skew-lines. It's not as if the FDA is going to say, well, that's what they told the SEC, so I guess we're good to go. I mean, that just isn't the way it works. And the company was raising money during this time. And like most new ventures, it's burning through a lot of money. It needs to raise money to stay alive. Absolutely. And that's why many cases, including regal pharmaceuticals, hold that that particular corporate motive cannot support an inference of cyanide, Your Honor. I would point out, as I indicated, the very risks that the plaintiffs say were not disclosed were, in fact, disclosed. We've put that in our brief. Also, you know, it's very significant that the serious and moderate side effects that were observed in the clinical trials were disclosed, and they were disclosed accurately. And this takes the case completely out of the realm of cases like immune response, which the plaintiffs rely upon substantially in their brief. In that case, the defendant said this drug for HIV treatment is efficacious. It works, knowing that they had a statistically flawed methodology and knowing they had another more comprehensive trial that showed it didn't work. That's a very different case than this one, Your Honor, because there's no indication, as Your Honor's discussion with counsel suggests, that when we said there was no signal for suicidal ideation, that there, in fact, was a signal for suicidal ideation. Your Honor has accurately pointed out the inconsistency between the July 13th release of the data and plaintiffs' invocation of the fraud-on-the-market theory. The two are completely inconsistent. And it's particularly inconsistent because we actually know that the market did react to this news. It's not like they needed more time to react. They did react, and they reacted positively. And finally, Your Honor, on the issue of Cyanar, I'll quickly point out that the fact that a substantial minority of the advisory committee agreed with the conclusion that the company had been stating publicly has to negate the notion that they were reckless or intentionally false in stating that opinion. These are key experts from around the country who looked at the data thoroughly and came to the conclusion that the drug was approvable at that time. In short, Your Honor, we've gone through in our brief many other reasons why the plaintiffs have failed to allege a false statement, have failed to allege Cyanar, have focused on statements that are not actionable under the PSLRA safe harbor or under the puffery doctrine. And we think that in sum, Judge Hamilton got it right. We urge affirmance, and I'm happy to answer any further questions, but I believe my time is about expired. Roberts, we thank you. We'll hear from Mr. Weiss for rebuttal. Weiss, thank you, Your Honor. I just want to make a few points. First of all, I think in this case, again, as we've said, Ciantra couldn't be clear. The company had, as of the beginning of the class period, had analyzed full phase III data from two trials. Moreover, I'd point out that recklessness under the case law in the circuit suffices to establish Ciantra. It's important to understand here, too, that the risks that we complain were not properly revealed to the public, not just went to the — didn't just go to the approval of the drug, but also to its commercial prospects. And whether or not the FDA ultimately approved the drug, that doesn't bear on what risks the — what relevance the risks had to the ultimate market for the drug and to its commercial prospects. Moreover, we don't know ultimately why the FDA approved the drug. The approval process involves a balancing of safety and efficacy. Obesity is a significant problem in the country today, and the FDA didn't necessarily conclude that there were no safety issues, only that on the balance — But the company never said there were no safety issues. Nobody ever said there were no safety issues. No, but the FDA wasn't necessarily agreeing with the company's assessment of the safety issues by its approval of the drug, ultimately. The FDA has to weigh efficacy and the need for the drug versus — But you're not really faulting defendants in a big-picture sense as to safety factors. As I understand the case, it's tied very much to whether the safety factors are going to be sufficiently great to lead to the delay of approval, which they did. I mean, that's the strength of your case. But to tell me that the FDA later decides with more evidence that, well, maybe there's still a safety concern, but it's outweighed by the positive, I don't see how that helps your case. Why does that make me think that what the defendants said at the earlier phase was made with any kind of knowledge that the safety factors were going to balance against them? Again, the claim here is not that the defendants understood or knew that the safety factors would balance against them, but only that there were significant risks in approval and for the commercialization of the drug relating to its safety, and those risks were known to them. Thank you, Your Honor. Roberts. Thank you. We thank both counsel for your helpful arguments in this very complicated case.
judges: Adelman, Noonan, Clifton